*In re* MARRIAGE OF JAMES J. GORMAN, Petitioner-Appellant, and SHARON E. GORMAN, Respondent-Appellee.

First District (3rd Division)    No. 1—95—0164

Opinion filed September 30, 1996.

McDermott, Will & Emery, of Chicago (Neil F. Hartigan, Steven F. Pflaum, Susan M. Rifken, and Corey B. Rubenstein, of counsel), for appellant.

Jerome Marvin Kaplan, Alan D. Hoffenberg, and Lesly F. Datlow, all of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

The circuit court granted respondent Sharon E. Gorman's (Sharon's) petition pursuant to section 2—1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)) to vacate the property settlement agreement (Agreement) that had been incorporated into the judgment of dissolution of marriage (Judgment) for Sharon and petitioner James J. Gorman (James).

On appeal, James asserts that the circuit court erred and contends (1) that the appearance form filed on behalf of Sharon was sufficient to confer personal jurisdiction over Sharon in the dissolution of marriage proceedings; (2) that the Agreement was neither unconscionable nor obtained by coercion on the part of James; and (3) that Sharon failed to exhibit due diligence in presenting grounds for relief advanced in her section 2—1401 petition. In addition, Sharon contends, for the first time on appeal, that the trial court lacked subject matter jurisdiction over the dissolution proceedings because the parties were not separated for two years before the initiation of such proceedings.

We agree with James and, therefore, reverse the circuit court's order vacating the Agreement. We also reject Sharon's assertion that the trial court lacked subject matter jurisdiction.

On November 5, 1977, James married Sharon. On April 2, 1991, James filed his petition for the dissolution of marriage. On April 9, 1991, a prove up was held and the trial court entered a judgment for dissolution of marriage which incorporated the property settlement agreement.

At the prove up on April 9, 1991, only James testified because, at that time, Sharon was in California. Prior to the prove up, however, Sharon had signed the necessary papers, *i.e.*, a *pro se* appearance, the Judgment and the Agreement. James testified that he cohabited with Sharon until December 15, 1988, and their efforts to reconcile had failed. James testified that he and Sharon entered into a property settlement agreement. In response to a question posed by the court, James testified that Sharon has had the advice of an attorney and she met with a lawyer before she signed the agreement. In addition, James' attorney represented to the court that he had spoken to Sharon the previous night "just to make sure there were no problems or any last minute things she needed to know, and she told me she was quite comfortable with the settlement and that she would be divorced today."

The court then entered the Judgment incorporating the Agreement. Pursuant to the Agreement, Sharon received: the California house; $10,000 cash; the right to one-half the net proceeds of James' individual retirement account (IRA) upon his death or termination of the account; 1990 Mitsubishi Montero automobile; and the right to resume the use of her maiden name, Sharon Gilchrist.

Pursuant to the Agreement, James received the Chicago house. James incurred sole responsibility for paying all the taxes due on the parties' joint 1990 federal and state tax returns, including the taxes due from the sale of the Delavan, Wisconsin, property.

Each party retained his or her own respective IRA accounts, bank accounts, pension and profit sharing plans. The parties had already divided their personal property, and the items in their respective possession were deemed their sole property. Each party would bear sole liability for any and all debts and liabilities that he or she, respectively, had incurred.

More than 19 months later, on November 23, 1992, Sharon filed a motion to vacate the Judgment, asserting that the court lacked personal jurisdiction over her based on the allegedly improper appearance filed on April 9, 1991, at the prove up. While the November 1992 motion to vacate remained pending and undetermined, Sharon filed, on March 29, 1993, a section 2—1401 petition to vacate the Agreement incorporated into the Judgment. Sharon again asserted that the court lacked personal jurisdiction over her and additionally

contended that the Agreement was unconscionable and procured by duress and harassment on the part of James.

On October 31 and November 1, 1994, a hearing was held on Sharon's petition to vacate the Agreement. Both Sharon and James testified at the hearing.

Sharon testified that, when they first married in 1977, she and James rented an apartment on Division Street in Chicago. In 1978, less than one year after marriage, the couple moved to Houston, Texas, due to a company transfer for James. The couple purchased a home in Houston and remained there until James was transferred back to Chicago in November 1981.

Upon their return to Chicago in 1981, the couple bought a condominium at 881 North LaSalle. In 1982, less than one year later, the couple moved to a smaller condominium at 900 North Lake Shore Drive and bought a home in Delavan, Wisconsin, which they went to on a weekly basis. In April or May of 1989, the couple sold the condominium at 900 North Lake Shore Drive and moved to a home at 1849 North Halsted Street, costing $256,000.

In the spring and summer of 1990, the couple began discussing moving to California. Sharon testified that she regretted moving from Chicago because she "wanted very much to wait until [James] was 55 years old to sell anything because [she] knew that [they] could get a reduction in the real estate and [they] wouldn't have to pay those capital gains." At the end of May 1990, the Halsted Street and Delavan properties were placed on the market. In June 1990, Sharon found a house in Irvine, California, and signed a contract for the property in the amount of $412,000, with a move-in date of September 1, 1990. Sharon moved to California in October 1990.

At the end of August 1990, the Delavan property sold for $700,000, providing net proceeds of $470,342.16. From the net proceeds, $104,000 was used for the California house and the remainder was put into a Paine Weber savings account, *i.e.*, $366,342.16.

In the beginning of September 1990, James moved to California and was able to maintain his employment with Korn Ferry, an executive search business. In October 1990, Sharon moved to California when her job transfer became effective. After their move to California, their Halsted Street property remained on the real estate market and Sharon wrote the checks to make the mortgage payments for both properties.

By October 1990, James and Sharon barely spoke to one another. Sharon testified that James was acting very strange and was not talking or communicating to her. James declined Sharon's suggestion to see a marriage counselor.

In January 1991, Sharon learned that James lost his job with Korn Ferry and that he decided to look for employment in Chicago. The couple put their California house on the market. Their house on Halsted Street in Chicago had still not been sold. According to Sharon, James told her that his priority was to get a job and he could not think about their relationship. James told Sharon that "[h]e needed to think, he needed time, he needed space, and he could not do that with me being with him." Sharon deliberated whether to return to Chicago and not live with James or to go somewhere else. Sharon decided to go to Atlanta, Georgia, because that is where she would have the best employment opportunities. Sharon testified that between January and March 1991, James was living with Sharon in California and the couple discussed separating but did not talk about getting a divorce.

On March 16, 1991, James left California on business and that was the last time Sharon saw him prior to the time he filed the divorce action. At that time, James and Sharon split up some household goods. The whole garage was full of boxes that had been packed by James, including most of his clothes and some furniture. The items were transported to Chicago by professional movers. The bulk of the household furniture and furnishings remained in the California residence for Sharon to take to Atlanta. For two months prior to March 1991, the couple talked about James returning to Chicago, Sharon moving to Atlanta, and both of them splitting up their household.

On March 22, 1991, a contract was obtained for the California house with a sale price of $420,000. The closing date was set for the middle of April. After speaking to James during the day about obtaining the contract and after signing the contract, Sharon left California that night (March 22) to travel to Atlanta, Georgia, to explore housing. The next day (March 23) Sharon found a place to live in Atlanta for $133,500, signed a contract for it, and told James about it by telephone that evening. James opined that Sharon was spending too much money.

On March 28, 1991, at 6:30 a.m. California time, James telephoned Sharon and informed her that he was sending divorce papers to her via Federal Express. Sharon testified that James told her if she signed the papers, the matter would be finished in nine days. If she did not sign the papers, James would not give her the money for Atlanta and she would not have any place to live. Sharon testified that James spoke in an intimidating tone of voice. Sharon testified that she felt she had to sign the papers because she did not have a house in California or Chicago anymore and if she did not get the money, she

would not have the property in Atlanta. Sharon further testified that James "was an extremely volatile person, very temperamental, constantly screaming and yelling at me, whether it was my fault for something or somebody else caused him anger."

The package of papers contained a copy of the petition for dissolution, a copy of the property settlement agreement and four copies of the *pro se* appearance. Sharon modified the Agreement by changing the date specifying the time they lived separately and apart from each other to December 15, 1988, and by crossing out language relating to James' IRA account. Sharon initialled every page and signed on the back. Sharon also signed and returned the appearance form.

On March 29, 1991, Sharon took the divorce papers to a California attorney to ascertain whether they were legal documents. The California lawyer stated that he was not familiar with Illinois law or her marital assets and recommended that Sharon get an attorney. On March 30, 1991, Sharon signed and returned the papers.

On April 8, 1991, Sharon had a conversation with Saul Foos, James' attorney. Mr. Foos telephoned Sharon and asked if she thought there was anything else, such as any other assets. Sharon responded that it was fine. On April 9, 1991, the prove up was held and the Judgment was entered.

In July 1991, in a phone conversation, James told Sharon that he had a new woman in his life. In December 1991, Sharon met with a lawyer to seek advice about the contents of the Agreement. Sharon waited until that time to obtain legal advice because she did not realize until the fall of 1991 that she and James were not going to get back together when she found out that James had a girlfriend.

James testified that while married to and living with Sharon, he met his current wife Jill at the end of July or the first of August 1990. Since they lived in different States, James and Jill saw each other very infrequently for the next six months. James testified that he did not recall his testimony at the prove up.

Sharon had been steadily employed with Delta Airlines before, during and after the marriage. In 1992, Sharon began working with Private Jet Expedition. During the marriage, James lost his job twice. About 1987 or 1988, James was unemployed, and in January 1991, James lost his job and relocated back to Chicago.

On December 2, 1994, the trial court entered an order vacating the Agreement of April 1991. The court specifically found that the Agreement was unconscionable; that Sharon was forced and coerced by James to enter into the Agreement; that Sharon exercised due diligence based in part on the fact that Sharon continued to hope that she would be able to get back together with James after Judgment

had been entered; that even if the requirement of due diligence had not been satisfied, justice and fairness required that the Judgment be vacated and thus the requirement of due diligence need not strictly be applied; and that the court lacked *in personam* jurisdiction over Sharon because the appearance filed on behalf of Sharon does not bear her signature and she did not authorize the signing of the document. Subsequently, the court denied a motion for reconsideration filed by James.

On appeal, James asserts that the trial court erred in finding a lack of personal jurisdiction over Sharon in the divorce proceedings. James argues that personal jurisdiction was conferred because Sharon signed a *pro se* appearance, returned the document to James' attorney for use in the divorce proceedings, and, thereby, intended to appear and be bound by the judgment.

Sharon contends that the circuit court lacked personal jurisdiction over her at the time judgment was entered because the appearance form filed at the prove up was signed by James' attorney (Saul Foos) and that Sharon did not give him the authority to sign an appearance on her behalf. Sharon concedes that she signed an appearance form *pro se* before the prove up.

Initially we observe that Sharon failed to provide any authority for the jurisdictional issue and argument. Such failure violates Illinois Supreme Court Rule 341, which governs appellate briefs. 134 Ill. 2d R. 341. Rule 341(e)(7) mandates that an appellant's brief include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." 134 Ill. 2d R. 341(e)(7). This mandate also applies to an appellee under Rule 341(f), which provides that "[t]he brief for the appellee and other parties shall conform to the foregoing requirements." 134 Ill. 2d R. 341(f).

Personal jurisdiction is acquired either by service of summons or by general appearance, and it is derived from actions of the person sought to be bound. *In re Marriage of Verdung*, 126 Ill. 2d 542, 547 (1989); *In re Marriage of Wilson*, 193 Ill. App. 3d 473, 480 (1990).

■ In the present case, there is no dispute that Sharon was not served with a summons. However, the requirement of prior service of process is waived where a person participates in the court proceeding, thereby recognizing the case as being in court. *E.g.*, *In re Estate of Zoglauer*, 229 Ill. App. 3d 394, 397 (1992). Sharon certainly recognized and participated in the case by signing and returning the forms necessary to the dissolution of marriage proceedings, such as the Judgment and Agreement.

Sharon signed and returned a *pro se* appearance to James' at-

torney, and James' attorney signed and submitted to the court another version of the appearance form to the court. Both forms clearly indicate that Sharon was entering a *pro se* appearance.

We do not believe that the validity of Sharon's appearance was in any way undermined or insufficient merely based on the filing of the more current version of the appearance form used in the domestic relations division. "[I]n a variety of contexts, the law has consistently interpreted 'signed' to embody not only the act of subscribing a document, but also anything which can reasonably be understood to symbolize or manifest the signer's intent to adopt a writing as his or her own and be bound by it." *Just Pants v. Wagner*, 247 Ill. App. 3d 166, 173 (1993). In *Just Pants*, an arbitrator's name was typewritten at the end of a memorandum prior to the arbitrator's death. *Just Pants*, 247 Ill. App. 3d at 174. The court held that the typewritten name "can serve to manifest his intent that the 11-page memorandum constitutes his final word on the subject and that he adopted it as his opinion of the proper resolution of the dispute between the parties." *Just Pants*, 247 Ill. App. 3d at 174. Moreover, the court held that "the typewritten name at its end can execute and give legal effect to the memorandum, for we cannot agree with defendant that such an endorsement by an arbitrator of his award is to be accorded no more importance than if it had been accomplished by means of a smoke blanket." *Just Pants*, 247 Ill. App. 3d at 174; see also *People v. Stephens*, 12 Ill. App. 3d 215, 217 (1973) ("It is the intent of the person executing his signature, not the manner by which it is executed, which determines the signature's validity").

Similarly, we find in the present case that Sharon's undisputed signature on the *pro se* appearance, albeit a different version of the same form, constitutes her intent to adopt and enter such appearance. Moreover, "[a]ny action taken by a litigant which recognizes the case being in court will amount to a general entry of appearance unless such action was for the sole purpose of objecting to jurisdiction over the person." *Zoglauer*, 229 Ill. App. 3d at 397; see also *Verdung*, 126 Ill. 2d at 547-48 ("[t]here are, nevertheless, instances prior to entry of a general appearance or service of process where the court may have jurisdiction over a party because of either the person's participation in the case or recognition of benefits from the proceedings") (and cases cited therein).

We do not condone or approve of counsel signing Sharon's name without her knowledge or consent. That act was inappropriate. However, it does not alter the fact that she had previously voluntarily signed a *pro se* appearance form and forwarded it to counsel for filing.

Next, James asserts that the trial court erred in finding that he coerced Sharon to enter into the Agreement and the Agreement was unconscionable.

Sharon contends that coercion by James and unconscionability of the Agreement were shown by the following circumstances: (1) Sharon was not represented by counsel of her choice; (2) a period of only 12 days elapsed between the time Sharon was sent the Agreement and the time Judgment was entered; (3) Sharon believed that James did not want a divorce; (4) Sharon believed that she and James would get back together; (5) James initiated the relocation to California and then returned to Chicago; (6) Sharon believed that she would not get the money for the Atlanta property unless she signed the Agreement and attendant documents; and (7) the terms of the Agreement unreasonably favor James.

■ When a party seeks to vacate a property settlement incorporated in a judgment of dissolution of marriage, all presumptions are in favor of the validity of the settlement. *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 214 (1994).

A settlement agreement can be set aside if it is shown that the agreement was procured through coercion, duress or fraud, or if the agreement is unconscionable. *In re Marriage of Flynn*, 232 Ill. App. 3d 394, 399 (1992).

Coercion has been defined as "the imposition, oppression, undue influence, or the taking of undue advantage of the stress of another, whereby that person is deprived of the exercise of her free will." *Flynn*, 232 Ill. App. 3d at 401. The person asserting coercion bears the burden of proving it by clear and convincing evidence. *Flynn*, 232 Ill. App. 3d at 401.

■ Our review of the record establishes that there is simply no evidence, let alone clear and convincing evidence, that would rise to the level of coercion to justify vacating the Agreement. The record reveals that Sharon was well aware of the assets held by the couple, was not unsophisticated in financial matters, voluntarily agreed to live in different states, chose to remain unrepresented even after a California lawyer recommended that she obtain legal counsel, and freely and voluntarily entered into the Agreement. While we sympathize with Sharon's belief that she and James would reconcile, we also note that Sharon did not object to the Agreement until she discovered that James had entered a relationship with another woman. "A court should not set aside a settlement agreement merely because one party has second thoughts." *Hamm-Smith*, 261 Ill. App. 3d at 214, citing *In re Marriage of Steichen*, 163 Ill. App. 3d 1074, 1079 (1987); see also *In re Marriage of McCaskey*, 167 Ill. App. 3d 860,

865 (1988) ("[w]aiting until after Larry's remarriage and his termination of the maintenance is not conducive to a persuasive argument of coercion and duress"); *Horwich v. Horwich*, 68 Ill. App. 3d 518, 522 (1979) (a change of mind should not render the settlement invalid). Under the facts of this case, we cannot find clear and convincing evidence to justify a finding of coercion.

■ To determine whether an agreement is unconscionable, we consider two factors: (1) the conditions under which the agreement was made; and (2) the economic circumstances of the parties that result from the agreement. *Hamm-Smith*, 261 Ill. App. 3d at 219. Unconscionability encompasses "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *In re Marriage of Broday*, 256 Ill. App. 3d 699, 704-05 (1993).

■ In the present case, the parties agree that Sharon received assets with a total value of $137,000 from the proceeds from the sale of the California house ($83,000), cash ($10,000), a Mitsubishi car ($20,000), and an employment savings plan ($24,000). The parties disagree about the value of the assets received by James. Sharon submits that the total value of the assets distributed to James amounted to $490,000, while James places the value of his assets at $340,000. Most notably, however, Sharon fails to represent the value of the liabilities James bore. In the Agreement, James expressly agreed to be "solely responsible for paying all the taxes due on the parties['] joint 1990 Federal and State tax returns as a result of the sale of [the Delavan, Wisconsin,] property." James represents that the tax liability for the Wisconsin property amounted to $68,200. Moreover, the April 1991 Agreement provided that Sharon received the California property while James received the Chicago property on Halsted Street, which had been on the real estate market since May 1990 when the couple decided to move to California. When the Halsted Street property eventually was sold, a loss of $30,000 was incurred. Regardless of which parties' figures are employed, James received a greater share of the net assets. However, "that an agreement merely favors one party over another does not make it unconscionable." *Hamm-Smith*, 261 Ill. App. 3d at 220.

The record also reveals that Sharon was steadily employed before, during and after the marriage. Although the income of James substantially exceeded the income of Sharon when he was working, James was unemployed at least twice during the marriage. Less than one month before the Judgment, James relocated to Chicago to find employment because he had recently lost his last job. The record does not indicate when James secured employment.

To rise to the level of being unconscionable, the settlement must be improvident, totally one-sided or oppressive. *Flynn*, 232 Ill. App. 3d at 400. We find that the division of the marital property in the Agreement in the present case does not remotely rise to the level of unconscionability.

■ Finally, the purpose of a section 2—1401 petition for relief from judgment is to bring facts to the attention of the court which, if known at the time of judgment, would have prevented its entry. *Hamm-Smith*, 261 Ill. App. 3d at 214; *Broday*, 256 Ill. App. 3d at 705. The aim of the court in applying this section is to achieve "justice, not to give the litigant 'a new opportunity to do that which should have been done in an earlier proceeding' or to relieve the litigant 'of the consequences of his mistake or negligence.' " *Broday*, 256 Ill. App. 3d at 705, quoting *In re Marriage of Travlos*, 218 Ill. App. 3d 1030, 1035 (1991). Although the granting or denying of a section 2—1401 petition falls within the discretion of the trial court, we hold that Sharon failed to prove coercion or unconscionability and thus her petition to vacate the Agreement should have been denied.

■ Finally, Sharon seeks, for the first time on appeal, to challenge the validity of the Judgment based on alleged lack of subject matter jurisdiction. Sharon argues that she and James did not satisfy the two-year separation requirement provided in the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/401(a)(2) (West 1992). Sharon maintains that the uncontroverted testimony showed that she and James did not separate until March 16, 1991, less than one month before the Judgment was entered.

We reject Sharon's argument because the trial court had general jurisdiction over the dissolution proceedings and because Sharon adjudicated her rights to final judgment and made no objection to subject matter jurisdiction before this appeal. *In re Marriage of Monken*, 255 Ill. App. 3d 1044, 1046 (1994); *cf. In re Marriage of Robinson*, 225 Ill. App. 3d 1037 (1992) (where the parties have lived separately for a period of not less than six months, the two-year waiting period can be waived by written stipulation but an oral waiver is not sufficient to confer subject matter jurisdiction to enter an order of dissolution).

Moreover, the date of the parties' legal separation is stated as December 15, 1988, on the petition for dissolution of marriage, the Judgment and the Agreement. In addition, for purposes of a no-fault divorce under the Act, the two-year separation requirement can be satisfied even where the couple live in the same house because irreconcilable differences can be realized between the couple without living in separate residences. See *In re Marriage of Dowd*, 214 Ill.

App. 3d 156 (1991); *In re Marriage of Kenik*, 181 Ill. App. 3d 266 (1989).

For all the foregoing reasons, we reverse the order granting Sharon's petition to vacate the Agreement incorporated in the Judgment.

Reversed.

TULLY, P.J., and GALLAGHER, J., concur.