# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Roepenack*, 2012 IL App (3d) 110198

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF CHAT T. ROEPENACK, Petitioner-Appellant, and KATHLEEN L. ROEPENACK, Respondent-Appellee. |
| District & No. | Third District<br>Docket No. 3-11-0198 |
| Filed | March 2, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order granting respondent's petition under section 2-1401 of the Code of Civil Procedure alleging that the judgment dissolving the parties' marriage was procured by fraud and was unconscionable was affirmed where respondent was not represented by counsel, petitioner misstated his income during the settlement negotiations, he failed to disclose information concerning the parties' business interests, petitioner received the majority of the marital assets, he submitted an unauthorized deviation of child support, he failed to disclose assets, and it was unlikely the trial court would have approved the settlement agreement if the court had been provided with complete information; therefore, the trial court properly vacated the settlement agreement, save the portion granting the parties joint custody of the children, and remanded the cause for further proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 09-D-310; the Hon. Paul P. Gilfillan, Judge, presiding. |
| Judgment | Affirmed and remanded. |

Counsel on
Appeal

Derek Schroen (argued), of Benckendorf & Benckendorf, PC, of Peoria, for appellant.

David M. Lynch (argued), of Lynch & Bloom, of Peoria, for appellee.

Panel

PRESIDING JUSTICE SCHMIDT delivered the judgment, with opinion. Justices Holdridge and Wright concurred in the judgment and opinion.

## OPINION

¶ 1     On August 12, 2009, the trial court entered a judgment dissolving the marriage of petitioner, Chad T. Roepenack, and respondent, Kathleen L. Roepenack, and incorporating the parties' marital settlement agreement. On May 12, 2010, Kathleen filed a petition under section 2-1401 of the Code of Civil Procedure for relief from judgment (735 ILCS 5/2-1401 (West 2008)), alleging that portions of the judgment were unconscionable and procured by fraud. The trial court granted Kathleen's petition and vacated provisions of the parties' marital settlement agreement (judgment). Chad appeals from the trial court's order granting Kathleen's petition for relief from judgment, arguing that the trial court erred in: (1) finding that the marriage settlement agreement was unconscionable; and (2) admitting a business appraisal into evidence. We affirm.

¶ 2                                          FACTS

¶ 3     The parties married on February 10, 2000. Children were born August 15, 2001, and April 19, 2005. On June 16, 2009, Chad filed a petition for dissolution of marriage alleging that Kathleen was guilty of extreme and repeated mental cruelty. In the petition, Chad requested custody of the minors subject to Kathleen's visitation, child support, and a division of the marital and nonmarital property. On July 2, 2009, Kathleen and Chad signed a marital settlement agreement and a joint-parenting agreement, at which time Kathleen was unrepresented by counsel and Chad was represented by counsel. Kathleen also signed an entry of her appearance in the case and waived any further notice.

¶ 4     On August 12, 2009, Chad and his attorney attended a prove-up hearing for entry of a judgment of dissolution of marriage. Kathleen was neither present at the hearing nor represented by counsel. Chad testified that his 2008 income was $100,000. (This testimony was ultimately proven false.) The trial court entered a judgment for dissolution of marriage, incorporating the terms of the parties' marital settlement agreement dated July 2, 2009.

¶ 5     Under the terms of marital settlement agreement, Chad was awarded all interest in the businesses, CT Rope Co. (CT Rope) and Rope & Clark JJ Development Co. (Rope & Clark).

Kathleen was awarded the marital home and was required to pay $13,000 into the minors' college fund. Each party was awarded all interest in his/her own respective pension and retirement programs, checking and savings accounts, and life insurance policies.

¶ 6 Chad was given sole possession and responsibility for the lease payments on the parties' Toyota Tundra. Kathleen was to receive the title to the parties' Land Rover prior to the entry of judgment of dissolution. Kathleen would be responsible for the $933 monthly payment on the Land Rover but would be entitled to $475 of additional maintenance while she was making payments. The Land Rover would be transferred to Chad on July 1, 2010, with Chad responsible for the remaining debt, or Kathleen could transfer the Land Rover to Chad at anytime prior thereto.

¶ 7 Chad was required to pay for three semesters of college for Kathleen as a loan, which Kathleen was to repay into the minors' college fund within seven years. The minors' $10,000 college fund was to be administered by Chad and would be used toward Chad's contribution to the minors' college expenses. Chad was required to pay $531.59 in child support every two weeks. Kathleen would receive $2,833 per month in maintenance, which would be reduced to $1,417.50 per month after the second year, and terminate after the third year. After the initial six months, Kathleen's maintenance would also be reduced by 75% of her net income. The parties' joint custody of their two minor children was subject to the terms of the joint-parenting agreement.

¶ 8 On May 12, 2010, pursuant to section 2-1401 of the Illinois Code of Civil Procedure, Kathleen filed a petition to reopen or vacate the marital settlement agreement, alleging fraudulent concealment and misrepresentation on Chad's part. Specifically, the petition alleged that Chad knowingly misrepresented his 2008 gross income as $100,000 on a child support calculation sheet that he had provided to Kathleen. Kathleen also alleged that Chad failed to disclose the value of the businesses and did not inform her that there was a valuation that could be assigned to the ownership of the businesses that exceeded $1 million. Kathleen alleged that as a result of the marital settlement agreement, Chad received assets in excess of $1 million while she received less than $50,000 worth of assets.

¶ 9 Evidence at the hearing on Kathleen's petition indicated that the parties' corporations, consisting of Jimmy John's franchises, were formed during the marriage. In 2000, when the parties married, Chad was the general manager of a Jimmy John's franchise and then an area manager of multiple franchises. In 2003, the parties purchased a franchise in Pekin, Illinois, for $158,000 from their marital assets. In May 2004, the parties purchased another franchise in Lincoln, Illinois, for $125,000 from their marital assets. The Pekin and Lincoln franchises were incorporated into CT Rope.

¶ 10 In June 2006, Chad brought in a partner, who paid $180,000 for a 35% share of CT Rope. Chad and his partner also formed a 50/50 partnership as Rope & Clark and purchased a franchise in Morton, Illinois, for $290,000. They later purchased another franchise under Rope & Clark in East Peoria, Illinois, for $340,000. Chad testified that at the time of the parties' dissolution in 2009, CT Rope was $108,000 in debt and Rope & Clark was $340,000 in debt.

¶ 11 Until September of 2006, Kathleen did the accounting for the businesses. In 2007,

Kathleen became employed as a cheerleading coach for a junior high school, earning $3,000 per year, and was no longer involved in the businesses.

¶ 12 Although Kathleen was no longer involved in the operation of the businesses, on June 25, 2008, she cosigned for a business loan in the amount of $108,668 at Chad's request. On February 26, 2009, she cosigned for another business loan in the amount of $310,000 in anticipation of Chad purchasing the East Peoria franchise.

¶ 13 In April of 2009, the parties discussed getting divorced. In discussing child support, Chad e-mailed a document, prepared by his attorney, to Kathleen indicating that his gross income for 2008 was $100,000 and his net income was $70,516.75. The documents showed that Kathleen was entitled to 28% of Chad's net income as child support for two children in the amount of $19,775 per year "[l]ess 30% deviation due to amount of time with kids." According to the child support calculation sheet, the resulting child support that Chad owed Kathleen was $13,821.28 per year or $531.59 every two weeks.

¶ 14 Chad testified that during the marriage settlement discussions, the parties had specifically discussed that Chad's 2008 income was approximately $190,000. According to Chad, the parties agreed that child support would be based on a salary of $100,000 per year because that was the amount of income the parties were living on, while the remainder of their income was invested back into the businesses. Chad testified that the parties agreed that child support would be increased after Kathleen's maintenance terminated and that additional restaurants could be purchased to help Kathleen and the minors in the future. Chad testified that the trial court had not specifically approved of the child support deviation and was not informed of Chad's actual income of $211,000.

¶ 15 During their marriage, the parties filed a business tax return by March 15 each year and their personal tax return by April 15 each year. In 2009, Chad filed the parties' 2008 joint tax return on September 17, 2009, which was 38 days following the entry of the dissolution of marriage order. It was not until that day that Kathleen saw and signed the parties' 2008 tax return. Chad testified that the 2008 tax return was filed late because his partner was redoing their accounting. The parties' 2008 tax return, which was filed more than 30 days after the dissolution judgment, indicated that Chad's income was $211,000, based on Chad's personal salary of $71,000 and the corporations' income of $140,000. Kathleen's salary was $2,104.

¶ 16 During their marriage, the parties had a joint account out of which Kathleen paid their personal expenses. Chad had a business savings account, in which quarterly distributions from the businesses were deposited. Out of the business savings account, the parties paid for their vehicles, mortgage, debt, and vacations. Kathleen had no authority on the business savings account. Kathleen had a personal account that Chad deposited $400 per month into for Kathleen to "do whatever she want[ed] with."

¶ 17 All the paperwork for the businesses was kept in the sunroom of the parties' marital home until Chad moved out in May of 2009. Chad testified that Kathleen knew where the documents were located and they were never locked. Chad testified that he and Kathleen discussed his annual salary, and she had always known the amount of his real income. Chad testified that he discussed the progress of the businesses on a daily basis with Kathleen and that he "constantly told her how [they] were doing."

¶ 18 Kathleen testified that she received half the equity in the home and some personal property in the home in consideration for transferring her interest in the four franchises to Chad. Kathleen testified that at the time of the parties' dissolution, there was $30,000 in equity in the marital home of which she agreed to pay $13,000 to the minors' education trust. Kathleen testified that she gave the Land Rover back to Chad so she could purchase a vehicle with lower payments. Kathleen received no other benefits from the divorce.

¶ 19 In February 2009, in connection with the parties' loan request for the East Peoria franchise, Chad had received an appraisal valuing the Pekin, Morton, and Lincoln franchises at $1,150,000. Chad testified that he had a "quick discussion" about the appraisal with Kathleen as a "kind of pat on the back" in relation to how far the businesses had come. Kathleen testified that she knew an appraisal was going to be completed, but was never aware that one had actually been completed and she was not aware of the value of the businesses. Kathleen testified that during the settlement negotiations, Chad had indicated that the businesses carried a lot of debt and had practically no value. Kathleen testified that she did not know an appraisal of the businesses had been conducted until November 30, 2010, when she found out that an appraisal indicated that three of the four businesses were worth a total of $1.3 million.

¶ 20 Kathleen sought to admit the appraisal into evidence, and Chad objected on the basis of the document containing hearsay. The trial court admitted the appraisal into evidence with limitations. The trial court indicated that the appraisal would be admitted for "the secondary tertiary reasons dealing with state of mind and the overall ultimate issue *** [of] whether or not fraud or deception was involved."

¶ 21 Kathleen testified that she was not involved with the accounting for the business after 2006 and did not know the value of the businesses at the time of the divorce negotiations. Kathleen testified that Chad told her a portion of his income went back into the businesses, which was a legal deduction that was not applicable toward paying child support. He gave Kathleen a document created by his attorney indicating the amount of child support he was legally required to pay based upon a $100,000 income. Kathleen testified that she agreed to take less child support because she thought the agreed-upon amount was configured pursuant to law. Kathleen testified that she never agreed to allow Chad to keep money for his own purposes that should have been paid in child support.

¶ 22 At the time Kathleen agreed to the settlement, she thought Chad's salary was between $100,000 to $150,000. Kathleen testified that she did not know how much money Chad made from year to year and she had always been confused by the difference between Chad's income and the businesses' income. Kathleen testified that she signed the parties' joint tax returns and various loan documents without reviewing those documents because she always trusted Chad as her husband. Based on Chad's representations, Kathleen believed that any equity in the businesses was insignificant.

¶ 23 Kathleen testified that she received a copy of the 2008 tax return after the dissolution of their marriage was final. The return indicated that Chad's salary for 2008 was $211,000. At that time, Kathleen began questioning Chad about the amount of child support he was paying. Chad acknowledged that there was a difference in the amount of income used to

calculate the child support and his reported income for 2008. He indicated that the child support would be fixed at the time of the review of Kathleen's maintenance in two years.

¶ 24    On cross-examination, Kathleen testified that she paid the parties' personal bills from a joint checking account that she accessed online. She could see the business savings account online if she "clicked on it," but she never did. During the settlement negotiations, Kathleen had an initial consultation with an attorney, who told her that she should look into the proposed child support figure and should obtain a valuation of the businesses. She did not hire an attorney during the divorce proceedings because she felt she could not afford one.

¶ 25    Kathleen testified that during the settlement negotiations, she did not know Chad's true income, the value of the businesses, the exact value of the personal property she had been awarded, the existence of any retirement account, or the $30,000 in the business savings account. Kathleen testified that she discovered the existence of the retirement account after the dissolution.

¶ 26    On February 22, 2011, the trial court found that Kathleen had proven, by clear and convincing evidence, that the parties' marital settlement agreement was unconscionable and resulted from fraud in that Kathleen had proved Chad's intent to deceive her. The trial court granted Kathleen's petition for relief from judgment and vacated the marriage settlement agreement (except for the portion awarding the parties joint custody of the minors). Chad appealed.

¶ 27                                ANALYSIS

¶ 28            I. Unconscionability of the Marital Settlement Agreement

¶ 29    On appeal, Chad argues that the trial court erred in granting Kathleen's section 2-1401 petition to vacate the marital settlement agreement as unconscionable and the result of fraud. We disagree.

¶ 30    In order to receive relief under section 2-1401, a petitioner must affirmatively allege specific facts to support the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the petition. *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85 (2006). Although a section 2-1401 petition is ordinarily used to bring facts to the attention of the trial court, which if known at the time of judgment would have precluded its entry, it may also be used to challenge a purportedly defective judgment for legal reasons. *Id.* Relief under section 2-1401 may be available to set aside a settlement agreement that is unconscionable or was entered into because of duress, coercion or fraud. *In re Marriage of Johnson*, 339 Ill. App. 3d 237 (2003).

¶ 31    Unconscionable means that one party did not have a meaningful choice and the contract terms are unreasonably favorable to the other party. *In re Marriage of Gorman*, 284 Ill. App. 3d 171 (1996). The fact that an agreement merely favors one party over the other does not render the agreement unconscionable. *Id.* To rise to the level of being unconscionable, the settlement must be improvident, totally one-sided or oppressive. *Id.* To determine whether an agreement is unconscionable, a court must consider two factors: (1) the conditions under which the agreement was made; and (2) the economic circumstances of the parties that result

from the agreement. *In re Marriage of Bielawski*, 328 Ill. App. 3d 243 (2002).

¶ 32 Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act requires that the division of marital property upon the dissolution of marriage be in "just proportions" in light of the relevant circumstances of the parties. 750 ILCS 5/503(d) (West 2008). Although "just proportions" does not necessarily mean mathematically equal, the distribution must be equitable under the circumstances. *Bielawski*, 328 Ill. App. 3d 243.

¶ 33 To sustain a claim of fraud, the following elements must be proven: (1) false statement of material fact known or believed to be false by the party making it; (2) intent to induce another party to act; (3) action by the other party in reliance on the truth of the statement; and (4) damage to the other party relying on such statement. *In re Marriage of Morris*, 147 Ill. App. 3d 380 (1986).

¶ 34 In *People v. Vincent*, 226 Ill. 2d 1 (2007), our supreme court discussed the applicable standard of review in some proceedings involving section 2-1401 petitions, but did not directly address the standard of review in cases involving either the grant or denial of relief on a section 2-1401 petition after an evidentiary hearing. In *dicta*, the supreme court indicated that the abuse of discretion standard of review "does not match up with" disposition of a section 2-1401 petition following an evidentiary hearing. *Vincent*, 226 Ill. 2d at 17 n.5.

¶ 35 In this case, Kathleen's section 2-1401 petition for relief was granted after the trial court conducted an evidentiary hearing. Accordingly, we will review the trial court's judgment under the manifest weight of the evidence standard of review. *S.I. Securities v. Powless*, 403 Ill. App. 3d 426 (2010). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.*

¶ 36 Here, the record shows that during the settlement negotiations, Chad was represented by counsel and Kathleen was unrepresented. Kathleen testified that she did not believe that she could afford an attorney, and the record supports that belief as reasonable in that she only earned $3,000 per year. The parties' settlement discussions were over the course of only two months.

¶ 37 During the settlement negotiations, Chad gave Kathleen a child support calculation sheet that misstated his actual income, which he had claimed was a valid figure of his net income under applicable law. Chad conceded that his disclosure of earning $100,000 in 2008 was not accurate. The inaccuracy of Chad's disclosed income not only affected the child support calculation but also Kathleen's perceived value of the businesses. During the parties' negotiations, Chad had the benefit of having both an intimate familiarity with the franchises and an appraisal of those businesses. Not only did Chad fail to disclose the existence of the appraisal and appraised value of the businesses to Kathleen, but he led her to believe that the businesses were worth little to nothing. Additionally, Kathleen was unaware of the existence of a retirement account or that Chad would be receiving $30,000 that was in a savings account.

¶ 38 Although the record is not clear as to the exact value of the businesses at the time of the dissolution, it is clear that Chad testified that $913,000 had initially been invested into the businesses and the businesses had approximately $448,000 worth of debt. The total debt was

$108,000 for CT Rope and $340,000 of debt for Rope & Clark. Notably, Chad and Kathleen owned a 65% share in CT Rope, the corporation with less debt at the time of the dissolution. In addition, Chad testified that in 2006 his partner paid $180,000 for a 35% share of CT Rope, which suggests that CT Rope had a total value of $514,286 at that time. These figures support Kathleen's ideation that the businesses have substantial value, contrary to Chad's representations to her during the settlement negotiations.

¶ 39     The trial court's finding that the marital settlement agreement was unconscionable and procured by fraud was supported by the fact that Chad: (1) received the majority of the marital assets; (2) submitted an unauthorized deviation of child support to both Kathleen and the court; and (3) failed to disclose marital and personal assets. It is likely that the marriage settlement agreement would not have been approved had the trial court been furnished with complete information. Therefore, Kathleen presented a meritorious claim.

¶ 40     Chad argues that Kathleen did not use sufficient diligence in discovering the value of the business and other assets and presenting this claim to the circuit court in the original action. We believe the record supports the trial court's finding that Kathleen acted with adequate diligence. Kathleen had little money to hire an attorney. Additionally, she may have sought out the value of the businesses if Chad had not misled her into believing there was little to no value in the businesses. Nonetheless, the requirement that a section 2-1401 petition demonstrate diligence is not inflexible. *Johnson*, 339 Ill. App. 3d 237. When justice and fairness require, a judgment may be vacated even though the requirement of due diligence had not been satisfied. *In re Marriage of Hoppe*, 220 Ill. App. 3d 271 (1991). Where there is fraud or unfair conduct, the due diligence requirement will not be strictly enforced. *Ridgway v. Ridgway*, 146 Ill. App. 3d 463 (1986); *In re Marriage of Palacios*, 275 Ill. App. 3d 561 (1995). We find it significant that Chad testified to the accuracy of the admittedly inaccurate statement of income before the trial court in the original action. We have not only a fraud on Kathleen, but a fraud on the court as well. We find it appropriate here to lower the due diligence bar. Accordingly, the trial court's grant of Kathleen's section 2-1401 petition for relief after the evidentiary hearing in this case was not against the manifest weight of the evidence.

¶ 41     Chad additionally urges this court to find that the trial court erred in denying his request to sever and vacate only the provisions of the marital settlement agreement related to child support. Chad acknowledged that he had misrepresented his income for the purpose of child support and the trial court did not make a specific finding to deviate from the statutory guideline that he pay 28% of his net income in child support for two children. Chad does not dispute that the child support provisions of the marital settlement agreement should be vacated. However, he argues that the unenforceability of the child support provision does not render the remaining provisions unenforceable.

¶ 42     As discussed above, the trial court's findings that remaining provisions were also procured by fraud and were unconscionable are supported by the record. Chad's false representations and testimony regarding his 2008 income were also relevant to the value of the businesses from which the income was derived. Therefore, the trial court did not err in vacating the parties' marital settlement agreement in its entirety but for the portion granting the parties joint custody of the minors.

¶ 43                    II. Admission of the Business Appraisal Into Evidence

¶ 44    Chad argues that the trial court committed reversible error in admitting the business appraisal into evidence because it was hearsay. Evidentiary rulings will not be overturned absent a clear abuse of discretion. *Simmons v. Garces*, 198 Ill. 2d 541 (2002). In order to warrant a reversal, an evidentiary ruling must have been substantially prejudicial and affected the outcome of the case. *Id.* "Hearsay" is a statement, other than a statement made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). In other words, an out-of-court statement offered into evidence for some purpose other than to prove the truth of the matter asserted is not hearsay. *People v. Kliner*, 185 Ill. 2d 81 (1998). An out-of-court statement offered to prove its effect on a listener's mind or to show why he subsequently acted as he did is not hearsay and is admissible. *People v. Sorrels*, 389 Ill. App. 3d 547 (2009).

¶ 45    Here, the trial court allowed the appraisal into evidence for the limited purpose of determining whether fraud or deception was involved in this case on Chad's part. The appraisal was not admitted to prove the businesses' actual value. Instead, it was used to show Chad's state of mind as to fraud or deception. For that purpose, the appraisal was not hearsay. See *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814 (2009) (providing that the statement that damages to heating and air-conditioning units was $8,000 was not hearsay, where the statement was not offered to prove the actual amount of damages but was offered to show that the board had been alerted that there was damage to the units). Accordingly, the trial court did not abuse its discretion in allowing the appraisal into evidence to determine whether Chad knew of the existence of the appraisal and whether he disclosed or concealed its existence to Kathleen in support of Kathleen's theory of Chad's intent to deceive.

¶ 46    Further, even if the trial court had erred in allowing the appraisal into evidence, the error was harmless. As indicated above, there was evidence other than the appraisal that Chad had fraudulently concealed or misrepresented the value of the businesses. In this regard, we note that Chad's underrepresentation of his $211,000 annual income from the businesses by over 50% served to lower the perceived value of the businesses. The evidence that Chad procured the dissolution decree by a fraud upon both Kathleen and the court renders harmless any error with respect to the appraisal.

¶ 47                                       CONCLUSION

¶ 48    For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed, and this cause is remanded for further proceedings.

¶ 49    Affirmed and remanded.