2016 IL App (3d) 140990

Opinion filed May 3, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| KAREN K. LABUZ, | ) | of the 10th Judicial Circuit, |
| | ) | Peoria County, Illinois, |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | Appeal No. 3-14-0990 |
| | ) | Circuit No. 13-D-85 |
| | ) | |
| JEFFREY P. LABUZ, | ) | Honorable |
| | ) | Katherine Gorman, |
| | ) | Judge, Presiding. |
| Respondent-Appellant. | ) | |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Carter concurred in the judgment and opinion.
Justice Wright specially concurred, with opinion.

**OPINION**

¶ 1     The circuit court of Peoria County entered a final judgement for dissolution of marriage

which dissolved the parties' marriage and ordered respondent Jeffrey Labuz (Jeffrey) to pay

maintenance and child support. A postnuptial agreement signed by the parties was incorporated

into the judgment. Jeffrey did not contest the entry of the judgment at the time it was entered.

However, approximately five months later, Jeffrey filed a motion to vacate the judgment for

dissolution of marriage pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2012)), arguing that the parties' postnuptial agreement was unconscionable. Jeffrey subsequently filed an amended motion to vacate the judgment which raised essentially the same arguments. Karen filed a motion for summary judgment. After conducting an evidentiary hearing on Jeffrey's motion, the circuit court denied the motion. Jeffrey filed a motion to reconsider, which the circuit court denied.

¶ 2    This appeal followed.

¶ 3                                 FACTS

¶ 4    Jeffrey and petitioner-appellee Karen K. Reding (f/k/a/ Karen Labuz) (Karen) were initially married in 1991 and divorced in 2010. Their marriage produced one child, Emily, who was 14 years old at the time of the trial in this matter. During the parties' first marriage, which lasted approximately 18 years, Jeffrey paid 100% of Emily's day care, child care, school, and extra-curricular activity expenses.

¶ 5    The parties' 2010 divorce was memorialized in a "Consent Judgment of Divorce" filed on June 10, 2010 in the State of Michigan (the Michigan Consent Judgment). Both parties were represented by counsel during the Michigan divorce proceedings. In the Michigan Consent Judgment, Michael agreed to: (1) pay base child support of $441 every two weeks plus the gross amount of any bonuses he received from his employment as additional child support; (2) provide and pay for health insurance for both Karen and Emily; (3) pay 86% of Emily's medical, dental, hospital, orthodontic, prescription, psychological, psychiatric, or other reasonable and necessary uninsured health care expenses, as well as 86% of Emily's child care and extracurricular activity expenses; (4) pay for Emily's entire cell phone bill each month; (5) pay one-half of Emily's college tuition; (6) pay spousal support to Karen in a base amount plus 30% of any gross bonuses

2

Jeffrey earned over and above his base income continuing until Karen's death; (7) maintain life insurance on his life in an amount sufficient to pay Jeffrey's child support obligation through Emily's minority and Jeffrey's spousal support obligation to Karen. Moreover, although Jeffrey shouldered the lion's share of the child support obligations, he agreed in the Michigan Consent Judgment that Karen would be allowed to claim Emily as a tax deduction each year. During his evidence deposition in this case, Jeffrey agreed that he entered into the Michigan Consent Judgment voluntarily.

¶ 6    On September 22, 2012, Jeffrey and Karen remarried. Within one month of their remarriage, problems developed in their relationship. On December 6, 2012, Jeffrey and Karen began attending marriage counseling. During their second counseling session, the marriage counselor suggested that Jeffrey write up a postnuptial agreement in order to give Karen a sense of security and of Jeffrey's commitment to the relationship. In early December 2012, Jeffrey wrote and signed a document wherein he agreed to give Karen and Emily "100%" of his income, salary and commissions in the event that the couple divorced, as well the family house and its contents and Jeffrey's car. Jeffrey also agreed that Karen and Emily would remain beneficiaries on his insurance.

¶ 7    The parties separated on December 15, 2012. Twelve days later, Jeffrey wrote another document by hand which he, Karen, and Emily signed. The documents stated that "[i]f we get divorced I will do the following for Emily and Karen." It then listed several terms, including the following: (1) "[a]ll money made by Salary, Auto Reimbursement, and Commissions would be split by Jeffrey, Karen, and Emily, at a percentage to be determined by Jeffrey and Karen."; (2) "[p]ayments to Karen would last until she gets remarried"; and (3) "[p]ayments to Emily would end when Jeff dies."

3

¶ 8    On January 8, 2013, Karen met with attorneys at the law firm of Murphy & Dunn, P.C. On January 23, 2013, Karen signed a contract with Murphy & Dunn retaining their services as attorneys. Jeffrey was not a party to the contract. Two days later, attorneys at Murphy & Dunn produced a draft of a postnuptial agreement for Karen's review. Karen reviewed the draft agreement and she and Jeffrey discussed changes that they wanted to make to the document. Thereafter, Karen asked Murphy & Dunn to produce a modified draft, which it did on January 30, 2013. The modified draft contained various changes from the initial draft, including a change in the division of the house sale proceeds between the parties (from 60/40 in favor of Karen, to a 50/50 split). Karen and Jeffrey each reviewed the modified draft, and each made handwritten notes and proposed changes on the document.

¶ 9    On or around February 1, 2013, Jeffrey and Karen met at the offices of Murphy and Dunn where they reviewed a second modified version of the postnuptial agreement as well as a joint parenting agreement (JPA) with a paralegal. Jeffrey and Karen signed and notarized both documents. The first page of the postnuptial agreement stated that the agreement was to "resolve any future matters that would occur should either party choose to file a petition for dissolution of marriage." The agreement stated that "[t]he terms of the JPA and this Postnuptial Agreement shall be binding on both parties and incorporated into any Final Judgment for Dissolution of Marriage entered by the Court." In addition, the agreement provided that: (1) it was a fully negotiated agreement; (2) both parties understood that a court could resolve the issues differently and both parties had the right to litigate these issues if they wished; (3) Karen was represented by G. Edward Murphy and the law firm of Murphy and Dunn, P.C.; and (4) Jeffrey was representing himself and understood that he was acting as an unrepresented party in the matter.

¶ 10        On February 13, 2013, Karen filed a petition for dissolution of marriage.  Although the

parties had already signed the third draft of the postnuptial agreement, they continued to

negotiate changes to the agreement after Karen filed her dissolution petition.  For example,

Jeffrey told Karen that the agreement should be changed to reflect that Jeffrey's maintenance

payments to Karen would terminate upon Karen's remarriage, rather than her death (as the third

draft had provided).  This proposed change was incorporated into a fourth and final version of

the postnuptial agreement, which Jeffrey and Karen signed on March 5, 2013.  The agreement

was notarized that same day.

¶ 11        On March 18, 2013, Karen filed with the circuit court a document signed by Jeffrey

entitled "Formal Notice-Unrepresented Party."  The document, which was prepared by Karen's

divorce attorneys, provided:

> "This Notice has been prepared by Murphy & Dunn, P.C., attorneys for
> Petitioner, Karen Kyle Labuz, who advised and informed Respondent, Jeffrey
> Paul Labuz[,] that they have acted as counsel solely for Petitioner and do not
> advise or represent Respondent in this legal action.  Murphy & Dunn, P.C. have
> advised Respondent that he should secure counsel to represent him in this matter,
> but Respondent has refused to do so.  Respondent has carefully read this notice,
> fully understands its terms and willingly signs it."

¶ 12        Also on March 18, 2013, Jeffrey filed with the circuit court an "Entry of Appearance and

Waiver" which Jeffrey had signed and notarized on March 5, 2013.  This document provided that

Jeffrey  was entering his appearance in the divorce action and that Jeffrey "consent[ed] that any

and all orders may be entered" in the action," "including an order of default or a Final Judgment

for Dissolution of Marriage" without any further notice to Jeffrey as provided by statute.  Despite

the filing of this formal waiver of notice, a notice of hearing was sent to Jeffrey on March 18 advising him that a hearing on Karen's petition would take place on March 21, 2013.

¶ 13        On March 21, 2013, the circuit court entered a final judgment of dissolution of marriage which incorporated the final versions of the parties' postnuptial agreement and the JPA. In the final postnuptial agreement, Jeffrey agreed to: (1) pay base child support plus the gross amount of any bonuses he received from his employment as additional child support; (2) provide health insurance for both Karen and Emily; (3) pay 86% of Emily's medical, dental, hospital, orthodontic, prescription, psychological, psychiatric, or other reasonable and necessary uninsured health care expenses, as well as 86% of Emily's child care and extracurricular activity expenses; (4) pay for Emily's entire cell phone; (5) pay one-half of Emily's college expenses; (5) pay spousal support to Karen in a base amount plus 30% of any gross bonuses Jeffrey earned over and above his base income continuing until Karen's death or remarriage; (6) maintain life insurance on his life in an amount sufficient to pay Jeffrey's child support obligation through Emily's minority and Jeffrey's spousal support obligation to Karen. Jeffrey also agreed that Karen would be allowed to claim Emily as a tax deduction each year.

¶ 14        On May 8, 2013, Jeffrey signed a qualified domestic relations order which was entered by the circuit court on May 21, 2013. The qualified domestic relations order divided the "marital share" of Jeffrey's retirement account equally between Jeffrey and Karen and confirmed that Jeffrey and Karen were still in agreement with the terms of the settlement that had been incorporated into the final judgment order.

¶ 15        On August 19, 2013, Jeffrey filed a motion to vacate the judgment for dissolution of marriage pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2012)). Jeffrey argued that the postnuptial agreement that had been incorporated into the judgment was

6

unconscionable in that it was "unfair, inequitable and totally one-sided and oppressive to [Jeffrey]." Jeffrey maintained that the postnuptial agreement is one which "no man in his senses, not under delusion [*sic*], would make, on the one hand, and no fair and honest man would accept, on the other." In addition, Jeffrey contended that he had entered into the postnuptial agreement under duress because the agreement was negotiated while the parties were in the midst of a marital dispute, and Karen told Jeffrey that she needed him to sign the agreement in order to make her feel "safe" in continuing their marriage. Jeffrey argued that these circumstances put him in "a condition of such great stress that he was deprived of the exercise of his free will in the negotiation of the terms and in the execution of [the agreement]." Further, Jeffrey argued that the postnuptial agreement was invalid for lack of consideration and that Karen had entered into the agreement in bad faith without informing Jeffrey that she intended to file for dissolution of the parties' marriage.

¶ 16        Jeffrey filed an affidavit in support of his motion to vacate in which Jeffrey swore that: (1) he had entered into the postnuptial agreement in an effort to reconcile his marriage and to regain Karen's trust "so that [Karen] would feel confident in [Jeffrey's] dedication to her and agree to continue working on" the marriage; (2) Jeffrey thought that he and Karen would continue with marriage counseling; (3) "[a]t no time prior to signing the Post-Nuptial Agreement [did Karen] mention[] "divorce"; (4) when Jeffrey signed the postnuptial agreement, his understanding was that he and Karen "would continue to attend counseling and continue [their] attempts at reconciling [their] marriage"; (5) Jeffrey never met with attorney Edward Murphy and "nothing regarding the Post-Nuptial Agreement was ever explained" to Jeffrey; (6) Jeffrey was not represented by independent counsel in regard to the postnuptial agreement, nor was it ever

7

suggested to Jeffrey to hire independent counsel; (7) Karen filed a petition for dissolution of marriage nine days after the parties signed the postnuptial agreement.

¶ 17    On December 2, 2013, Karen filed a motion to dismiss Jeffrey's motion to vacate the judgment. In relevant part, Karen argued that Jeffrey had failed to plead specific facts in support of his allegations and that he had not presented clear and convincing evidence of coercion, as the law required. In an affidavit she filed in support of her motion to dismiss, Karen related the history of the parties' negotiations and joint execution of the postnuptial agreement and swore that: (1) Jeffrey was fully aware at that time that the parties were headed for divorce and that Karen had retained counsel; (2) Jeffery was actively engaged in the negotiating process; and (3) Jeffrey knowingly and voluntarily signed various drafts of the agreement, including the final agreement that was incorporated into the circuit court's dissolution judgment. Karen also submitted the Michigan Consent Judgment in support of her motion to dismiss.

¶ 18    Four days later, the parties entered an agreed order to dismiss Jeffrey's motion to vacate without prejudice and giving Jeffrey three weeks to file any new pleadings on the issue. The order provided that, if no new pleadings were filed by that date, the dismissal of Jeffrey's motion would be considered to be final and with prejudice. Jeffrey did not file any new pleadings by the three-week deadline. However, three days after the deadline passed, Jeffrey filed a motion for extension of time to file an amended motion to vacate the circuit court's judgment. Over Karen's objection, the circuit court granted Jeffrey's motion for extension of time and allowed him to file an amended motion to vacate.

¶ 19    On January 3, 2014, Jeffrey filed an amended motion to vacate the final judgment for dissolution of marriage. In his amended motion, Jeffrey alleged that the circuit court's judgment was both procedurally and substantively unconscionable. On August 15, 2014, Jeffrey filed a

8

memorandum of law in support of his amended motion to vacate. In his memorandum, Jeffrey argued that judgment was procedurally unconscionable because Jeffrey had negotiated and signed the postnuptial agreement under duress, without legal counsel, in the belief that he had to sign the agreement in order to save his marriage. Jeffrey also argued that the judgment was substantively unconscionable because it incorporated the postnuptial agreement's provisions on maintenance and child support, which were shockingly unfair, one-sided, and well above the statutory standard for such payments.

¶ 20      On September 4, 2014, Karen filed a "Motion for Summary Judgment And/Or Directed Verdict" in opposition to Jeffrey's amended motion to vacate the circuit court's dissolution judgment. On the same day, the circuit court held an evidentiary hearing on Jeffrey's amended motion to vacate, during which both of the parties testified and were cross-examined.

¶ 21      Jeffrey testified that, shortly after he and Karen remarried, problems developed in the relationship and Karen asked Jeffrey to leave the family residence in mid-December 2012. Jeffrey stated that, at that time, he and Karen were discussing "counseling" and "reconciliation," not divorce. The couple underwent counseling from December 2012 through February 19, 2013. During the second counseling session, the counselor suggested the parties have a postnuptial agreement because Karen was feeling unsure of Jeffrey's commitment to the relationship and needed a sense of safety. Jeffrey testified that he agreed to a postnuptial agreement because Karen gave him an ultimatum that either he sign the agreement or Karen would leave and take Emily to Arkansas (where Karen and Emily had lived before the parties remarried). Jeffrey claimed that he intended the postnuptial agreement to prevent a divorce.

¶ 22      Jeffrey testified that, when Karen hired attorney Murphy in January 2013, Karen gave Jeffrey the impression that they had hired him "together" to draft a postnuptial agreement. He

9

claimant that Karen assured him that there was "no need" for him to hire his own attorney and that it would just cost more money.

¶ 23    Jeffrey testified that he and Karen negotiated the terms of the postnuptial agreement over a six-week period (during which four separate drafts of the agreement were produced), and that he signed a draft of the agreement on February 4, 2013. However, Jeffrey claimed that, at the time he signed the agreement, he thought that he and Karen would "do as [they] agreed and continue to go to [marriage] counseling." Jeffrey stated that he did not "do the the math" for the obligations that he had agreed to in the postnuptial agreement at first because the parties were still going to counseling and because no support payments were being taken out of his check.[1]

¶ 24    Nine days after Jeffrey signed the postnuptial agreement, Karen filed for divorce. Subsequently, Jeffrey signed a final draft of the postnuptial agreement, the JPA, a judgment for dissolution of marriage, and an entry of appearance and waiver. Jeffrey testified that, even though he had no knowledge of Illinois marriage and divorce laws, he never had an attorney review any of these documents before he signed them because he was under the impression from Karen that he and Karen had hired Murphy together to draft the documents.

¶ 25    The matter was scheduled for a hearing on March 21, 2013. When Jeffrey asked whether he should be at the hearing, Karen said, "No. Don't worry about it. It's just a formality." In the presence of attorney Murphy and his paralegal, Jeffrey asked again whether he should appear at the hearing and was told that he did not have to attend. Jeffrey testified that he did not attend the

---

[1] Jeffrey stated that, when he did finally do the calculations after the dissolution judgment was entered, he realized that the agreement was "unsustainable" and "impossible for [him] to abide by."

10

hearing because he was told that it was not necessary for him to be there, and opined that, if he had been there, things might have ended up differently for him.

¶ 26    Jeffrey testified that he was fully employed in 2013 and earned a gross income of $169,788 that year.  However, Jeffrey stated that his base pay was only $77,562, that he was more likely to earn approximately $130,000 per year going forward, and that his salary in 2013 was an aberration.  Jeffrey noted that his gross pay calculations included his car allowance.

¶ 27    Karen testified that she and Jeffrey discussed divorce in December 2012 and agreed that, if they were to divorce, the handwritten documents that Jeffrey wrote and signed that month would be included as part of the divorce decree.  Jeffrey and Karen continued to discuss the possibility of divorce as they negotiated and finalized various drafts of the postnuptial agreements from the middle of January through March 4.  Karen maintained that, throughout that time period, she and Jeffrey agreed that the postnuptial agreements they were negotiating would be "included in the divorce" and would be the parties' "settlement documents" should a divorce occur.  According to Karen, the parties did not condition the use of the postnuptial agreements on Karen's agreement to continue attending marriage counseling with Jeffrey.

¶ 28    Moreover, Karen testified that she never stated or implied to Jeffrey that attorney Murphy or his law firm represented both Karen and Jeffrey.  Karen stated that Jeffrey never questioned whether there was a joint representation or made any comment suggesting that he believed there was a joint representation.

¶ 29    Karen testified that, by the time Jeffrey signed the final postnuptial agreement, the JPA, the entry of appearance and waiver, and the final judgment of dissolution of marriage on March 5, 2013, the parties had stopped attending counseling, and Jeffrey was aware that the parties were

11

divorcing.[2]  Jeffrey was also aware that the documents he signed on March 5, 2013, would be used in the divorce proceedings.  Attorney Murphy's paralegal had explained to Jeffrey that the dissolution judgment he signed (which incorporated the postnuptial agreement and JPA) "was the divorce judgment that would be [the parties'] judgment of dissolution of marriage."  Attorney Murphy's paralegal told Jeffrey that it was a "formality" for him to appear at the upcoming hearing because "there was already a court hearing set and the final judgment was ready to go."  According to Karen, Jeffrey did not object to the divorce or to the use of the documents he signed in the divorce.

¶ 30        On October 2, 2014, the circuit court denied Jeffrey's motion to vacate the dissolution judgment.  The circuit court found that: (1) the parties used the Michigan Consent Judgment during their negotiations over the postnuptial agreement in this case; (2) the terms of the Michigan Consent Judgment and of the postnuptial agreement in this case are "essentially consistent" as to "child support, health insurance, uncovered medical, spousal support, cellphone, and the tax deduction"; (3) throughout their negotiations in this case, Jeffrey made changes and was aware that [the] agreement could be used in court proceedings"; (4) "the documents that were signed contained a caption of a court case"; (5) "the parties had been through this process in Michigan" and Jeffrey was represented by counsel at that time; and (6) Jeffrey could have sought counsel at any time during the negotiations in this case.

¶ 31        The circuit court noted that a contract is procedurally unconscionable only if an impropriety in the process of forming the contract "deprived the party of a meaningful choice."

_____

[2] Karen stated that, after their final counseling session on February 19, 2013, Jeffrey and Karen had no further discussions about saving their marriage and made no further efforts to reconcile.

12

The court found that, in this case, Jeffrey "clearly had a choice," he took part in negotiations over a period of several months, and "he could have sought counsel at any time." The circuit court also found that Jeffrey had failed to provide proof of substantive unconscionability.

¶ 32    Jeffrey filed a motion to reconsider the circuit court's judgment, which the circuit court denied. This appeal followed.

¶ 33                                    ANALYSIS

¶ 34    On appeal, Jeffrey argues that the circuit erred in denying his section 2-1401 motion to vacate the marital settlement agreement as unconscionable. "The purpose of a section 2-1401 petition is for a party to bring to the court's attention facts that, if known to it at the time it rendered [its] judgment, would have changed the court's determination." *In re Marriage of Arjmand*, 2013 Il App (2d) 120639, ¶ 29; see also *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶ 30; *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 214 (1994). To obtain relief under section 2-1401, a petitioner must allege specific facts supporting: (1) the existence of a meritorious claim or defense; (2) due diligence in presenting this claim or defense to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition. *Arjmand*, 2013 Il App (2d) 120639, ¶ 29; *Roepenack*, 2012 IL App (3d) 110198, ¶ 30. The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence. *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 51. Relief under section 2-1401 is available to set aside a marital settlement agreement that is unconscionable or was entered into as a result of duress, coercion, or fraud. *Arjmand*, 2013 IL App (2d) 120639, ¶ 29; *Roepenack*, 2012 IL App (3d) 110198, ¶ 30.

¶ 35    In providing relief under section 2-1401, the court's aim is to "achiev[e] justice, not to give the litigant a new opportunity to do that which should have been done in an earlier proceeding"

13

or to relieve the litigant of "the consequences of his mistake or negligence." (Internal quotation marks omitted.) *In re Marriage of Broday*, 256 Ill. App. 3d 699, 705 (1993). Where a marriage settlement incorporated into a judgment is attacked through a section 2-1401 petition, "all presumptions are in favor of the validity of the settlement." *In re Marriage of Riedy*, 130 Ill. App. 3d 311, 313 (1985); see also *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 180 (1996); *Hamm-Smith*, 261 Ill. App. 3d at 214.

¶ 36    When a section 2-1401 petition presents a fact-dependent challenge to a final judgment, as here, we review the circuit court's ultimate decision for an abuse of discretion. *Walters*, 2015 IL 117783, ¶ 51.[3] A trial court abuses its discretion only when no reasonable person would take the view adopted by the trial court. *Arjmand*, 2013 Il App (2d) 120639, ¶ 32.

---

[3] Prior to our supreme court's decision in *Walters*, some decisions of our appellate court held that a trial court's ruling on a section 2-1401 petition should be reviewed under the manifest weight of the evidence standard if the trial court conducted an evidentiary hearing on the petition. See, *e.g.*, *People ex rel. McGuire v. Cornelius*, 2014 IL App (3d) 130288, ¶ 22, *rev'd on other grounds, DG Enterprises, LLC-Will Tax, LLC v. Cornelius*, 2015 IL 118975; *Roepenack*, 2012 IL App (3d) 110198, ¶ 40; *Domingo v. Guarino*, 402 Ill. App. 3d 690, 699 (2010). However, in *Walters*, our supreme court made clear that a fact-dependent challenge to a final judgment "invokes the equitable powers of the circuit court to prevent enforcement" of a judgment when it would be "unfair, unjust, or unconscionable." *Walters*, 2015 IL 117783, ¶ 39. Unlike a purely legal challenge, "a fact-dependent challenge to a judgment under section 2-1401 "must be resolved by considering the particular facts, circumstance, *and equities* of the underlying case." (Emphasis added.) *Id. ¶* 50. Accordingly, because it involves the discretionary exercise of equitable powers, a trial court's ruling on a fact-dependent section 2-1401 petition is reviewed for

14

¶ 37    A marital settlement agreement is unconscionable if there is "an absence of a meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 40; see also *In re Marriage of Steadman*, 283 Ill. App. 3d 703, 709 (1996). A finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both. *Arjmand*, 2013 IL App (2d) 120639, ¶ 30; *In re*

abuse of discretion. *Id.* ¶ 51. That remains true even if the trial court conducted an evidentiary hearing on the petition. See, *e.g.*, *Kaput v. Hoey*, 124 Ill. 2d 370, 375, 378 (1988) (reviewing trial court's denial of a section 2-1401 petition under the abuse of discretion standard even though the trial court held an evidentiary hearing on the petition). Although *Walters* did not involve an evidentiary hearing, the supreme court ruled categorically in *Walters* that *all* fact-dependent challenges under Rule 2-1401 are reviewed for an abuse of discretion; the supreme court made no exception for cases involving evidentiary hearings, even though it expressly acknowledged that evidentiary hearings should be held when the facts supporting the petition are challenged by the respondent. *Walters*, 2015 IL 117783, ¶ 51.

Thus, in our view, the only reasonable reading of *Walters* requires us to review the trial court's ultimate decision in this case for abuse of discretion, even though the trial court held an evidentiary hearing on Jeffrey's petition. When a trial court holds an evidentiary hearing on a section 2-1401 petition, we review the trial court's factual findings under a manifest weight of the evidence standard (*In re Marriage of Rocha*, 2015 IL App (3d) 140470, ¶ 34); however, we review the trial court's ultimate ruling on the petition for abuse of discretion (*Kaput*, 124 Ill. 2d at 378). Nevertheless, we note that, even if we were to review the circuit court's judgment under the manifest weight standard, we would reach the same result in this case.

15

*Marriage of Tabassum*, 377 Ill. App. 3d 761, 774 (2007). To determine whether an agreement is unconscionable, the court must consider two factors: (1) the circumstances and conditions under which the agreement was made; and (2) the economic circumstances of the parties that result from the agreement. *Arjmand*, 2013 IL App (2d) 120639, ¶ 30; *Roepenack*, 2012 IL App (3d) 110198, ¶ 31.

¶ 38       In this case, Jeffrey argues that the parties' postnuptial agreement was both procedurally and substantively unconscionable. We will address each of these claims in turn.

¶ 39                          1. Procedural Unconscionability

¶ 40       A marital settlement agreement is procedurally unconscionable when an impropriety in the process of forming the contract "deprived a party of a meaningful choice." *Tabassum*, 377 Ill. App. 3d at 775. Duress may make an agreement between spouses unconscionable. *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1082 (1992). Duress includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is "deprived of the exercise of free will." *Id.* " 'Acts or threats must be legally or morally wrongful to constitute duress [citation], and duress is measured by an objective test, rather than a subjective one [citation].' " *Baecker*, 2012 Il App (3d) 110660, ¶ 41 (quoting *Tabassum*, 377 Ill. App. 3d at 775). " 'The person asserting duress has the burden of proving, by clear and convincing evidence, that he was bereft of the quality of mind essential to the making of the contract.' " *Baecker*, 2012 Il App (3d) 110660, ¶ 40 (quoting *Hamm-Smith*, 261 Ill. App. 3d at 215). We review a trial court's finding of duress under a manifest weight of the evidence standard. *Baecker*, 2012 IL App (3d) 110660, ¶ 40; *Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*, 342 Ill. App. 3d 222, 224 (2003).

16

¶ 41	In this case, Jeffrey argues that the postnuptial agreement was entered into as the result of "considerable duress" placed upon him. Jeffrey notes that the agreement was negotiated and executed while the parties were attending counseling and attempting to reconcile and that Karen threatened to leave him and take Emily back to Arkansas or Tennessee unless Jeffrey signed the agreement. Accordingly, Jeffrey claims that he felt pressured to sign the agreement to save his marriage and to avoid losing custody of Emily.

¶ 42	However, Jeffrey fails to note that he signed the final version of the postnuptial agreement, JPA, and dissolution of judgment two weeks after he and Karen had stopped attending counseling and *three weeks after Karen had filed for divorce*. At that time, Jeffrey could not have reasonably believed that there was any possibility that the parties would reconcile. Karen testified that Jeffrey was aware at that time that the parties were divorcing and that the documents he was signing would constitute the parties' final divorce judgment. The postnuptial agreement itself explicitly stated that its terms shall be binding on both parties and incorporated into any final judgment for dissolution of marriage entered by the court. Nevertheless, Jeffrey raised no objection at that time to the divorce, to the terms of the postnuptial agreement, or to the use of that agreement during the divorce proceedings. He did not condition his assent to the agreement's terms upon Karen's agreement to attend further counseling or to make any further efforts to reconcile with Jeffrey. Nor did he condition his agreement on any promise by Karen to keep Emily in Illinois. Thus, the evidence does not support Jeffrey's argument that he felt pressured to sign the agreement in order to save his marriage or to avoid losing custody of Emily.[4]

_____

[4] In any event, even assuming *arguendo* that Jeffrey acted out of a reasonable fear that he might lose custody of Emily if he did not sign the agreement proposed by Karen, that fact would not

17

¶ 43    Jeffrey also notes that he was not represented by counsel during the negotiation and execution of the agreement and asserts that he "was under the clear impression from Karen that they had hired Mr. Murphy together" to draft the agreement and other relevant documents. Once again, however, the evidence does not support Jeffrey's assertion. The February 1, 2013, draft of the postnuptial agreement provided that Karen was represented by G. Edward Murphy and the law firm of Murphy and Dunn, P.C., and that Jeffrey was representing himself and "understood that he was acting as an unrepresented party in this matter." Jeffrey apparently never objected to this statement in the agreement, even though he read the February 1, 2013, draft and negotiated other changes to the agreement thereafter. Moreover, Jeffrey later signed a formal notice of unrepresented party, which was filed with the court on March 18, 2013. The Notice stated that Murphy & Dunn, P.C., had "advised and informed [Jeffrey]" that "they have acted as counsel solely for [Karen] and do not advise or represent [Jeffrey] in this legal action" and that "[Jeffrey] should secure counsel to represent him in this matter." The Notice further noted that Jeffrey had refused to obtain counsel and that Jeffrey had "carefully read this notice," "fully underst[ood] its terms" and willingly sign[ed] it."

---

clearly and convincingly demonstrate that he lacked the ability to make a voluntary decision. *Steadman*, 283 Ill. App. 3d at 710. Like the petitioner in *Steadman*, Jeffrey "agreed to negotiations, took part in the negotiations and then presented the substance of [those] negotiations, under oath, to the trial court." *Id.* During the negotiation process, Jeffrey obtained concessions from Karen on other issues, including the division of the house sale proceeds and the termination of maintenance payments upon Karen's remarriage. Thus, Jeffrey's purported fear of losing custody of Emily did not impair his ability to exercise his free will and make a meaningful choice. See *id.*

18

¶ 44     Moreover, Karen testified that she never stated or implied to Jeffrey that attorney Murphy or his law firm represented both Karen and Jeffrey. Karen stated that Jeffrey never questioned whether there was a joint representation or made any comment suggesting that he believed there was a joint representation. Although Jeffrey's testimony contradicted Karen's on these points, the circuit court was entitled to credit Karen's testimony over Jeffrey's, particularly given the signed documents and other evidence suggesting that Jeffrey knew that he was not represented by counsel.

¶ 45     Jeffrey's remaining arguments in support of his claim of procedural unconscionability also fail. Jeffrey argues that Karen put Jeffrey under duress by allowing Emily to be "actively involved in the negotiations of the postnuptial agreement." Specifically, Jeffrey claims that Emily sat down at the kitchen table with Jeffrey while he wrote out some notes about the agreement. Jeffrey appears to be referring to the December 2012 handwritten notes that he made before Karen retained counsel and the parties began exchanging typewritten drafts of the agreement and negotiating in earnest. Jeffrey does not suggest that Emily was present during any of the negotiations that took place at Murphy and Dunn's office in January and February of 2013. Nor does he claim that Emily was present when he signed the final draft of the agreement on March 5, 2013. Thus, the evidence does not suggest that Emily's presence caused any duress during the actual negotiation and execution of the agreement.

¶ 46     Moreover, Jeffrey argues that the postnuptial agreement contained a coercive and "threatening" provision suggesting that Jeffrey could be liable for attorney fees if he objected to the agreement or to the entry of the marriage settlement by the court. However, Jeffrey cannot reasonably argue that this unremarkable provision, which merely allocated potential liability for attorney fees, somehow robbed him of the ability to make a meaningful and voluntary choice,

19

particularly considering that Jeffrey could have objected to this provision during negotiations (as he did to other provisions).

¶ 47     Jeffrey also complains that the circuit court failed to make an independent inquiry "into Jeffrey's mental state, understanding, and his willingness to abide by the terms of the agreement." However, Jeffrey does not explain why the circuit court's failure to conduct such an inquiry *after* Jeffrey had already executed the postnuptial agreement and the agreed dissolution judgment somehow deprived him of his free will and his ability to make a meaningful choice before he executed those agreements. Moreover, Jeffrey gave the court no reason to conduct an inquiry because he signed agreements and agreed to the entry of the dissolution judgment without any further appearance or notice to Jeffrey. There is no evidence that Jeffrey disagreed with any aspect of the agreement or judgment at the time the circuit court entered the judgment. The evidence suggests that, if the court had asked Jeffrey about the agreement and judgment before it entered the judgment, Jeffrey would have voiced no objection.

¶ 48     Jeffrey also contends that Karen wrongly induced him to sign the postnuptial agreement by falsely suggesting that she intended to work on the marriage and reconcile with Jeffrey. As noted above, however, Jeffrey and Karen stopped attending marriage counseling and Karen filed for divorce weeks before Jeffrey signed the final version of the agreement. At that time, Jeffrey clearly knew that the parties' marriage was over and that the documents he was signing would be entered as the dissolution judgment. Nevertheless, he signed the documents and did not object to their terms or to the entry of a divorce. Thus, any prior statements by Karen about reconciliation or "working on the marriage" were moot at the time Jeffrey signed the agreement.

¶ 49     Finally, Jeffrey argues that Karen "offered no consideration in exchange for what Jeffrey gave up in the [a]greement." We disagree. "[A] mutual release of property rights by a husband

20

and wife is adequate consideration to support a post-nuptial agreement." *In re Estate of Brosseau*, 176 Ill. App. 3d 450, 453 (1988). In the final postnuptial agreement, Karen and Jeffrey each received numerous items of real and personal property and exchanged several waivers of property rights to certain items of marital and nonmarital property. To cite just one example, Karen waived the right to reimbursement of a $50,000 down payment of the house that she made prior to the parties' remarriage (which was a nonmarital contribution). Moreover, in exchange for their mutual assent to the terms of the agreement, Jeffrey and Karen each waived their right to a trial, which would have included the right to conduct potentially costly and burdensome discovery. They waived their right to assert any claims of dissipation and their right to litigate the issues settled by the agreement, including maintenance and attorney fees. By agreeing on joint legal custody of Emily with a JPA, Karen waived her right to request sole legal custody. In addition, Karen also agreed to forebear payments of support until she and Emily moved out of the marital residence. Accordingly, Jeffrey's claim that Karen offered no consideration for the postnuptial agreement is meritless.

¶ 50                                    2. Substantive Unconscionability

¶ 51        Jeffrey also argues that the postnuptial agreement is substantively unconscionable. A marital settlement agreement is substantively unconscionable if it contains terms "which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *Baecker*, 2012 IL App (3d) 110660, ¶ 41; see also *Steadman*, 283 Ill. App. 3d at 709. The fact that an agreement "merely favors one party over another does not make it unconscionable." (Internal quotation marks omitted.) *Baecker*, 2012 IL App (3d) 110660, ¶ 41; see also *Gorman*, 284 Ill. App. 3d at 181. "To rise to the level of being unconscionable, the settlement must be improvident, totally one-sided or oppressive." *Id.* at 182; see also *Arjmand*, 2013 IL App (2d)

21

120639, ¶ 30 ("substantive unconscionability involves a situation in which a clause or term in the contract is totally one-sided or harsh."). "Substantive unconscionability is based on the fairness and obligations of the contract's terms, and it can be shown by contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." (Internal quotation marks omitted.) *Tabassum*, 377 Ill. App. 3d at 777. An unconscionable bargain has been defined as one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." (Internal quotation marks omitted.) *Richardson*, 237 Ill. App. 3d at 1080. In determining whether an agreement is substantively unconscionable, a court considers the terms of the agreement and the economic circumstances of the parties that result from the agreement. *Arjmand*, 2013 IL App (2d) 120639, ¶ 30; *Roepenack*, 2012 IL App (3d) 110198, ¶ 31; *Richardson*, 237 Ill. App. 3d at 1080.

¶ 52    The postnuptial agreement in this case was not substantively unconscionable. In many respects, the terms of the agreement closely mirrored the terms of the Michigan Consent Judgment, which Jeffrey executed voluntarily while he was represented by counsel. Jeffrey agreed to pay $956 per month in base child support, which represented 20% of Jeffrey's net income, plus another 20% of his gross income as additional child support. In addition, Jeffrey agreed to pay 30% of his gross income as maintenance to Karen, modifiable and terminable only upon Karen's death or remarriage. Jeffrey also assumed responsibility for a number of other expenses (such as life insurance, health insurance for Karen and Emily, 86% of Emily's out-of-pocket health expenses and child care expenses, Emily's cell phone expenses, etc.).

¶ 53    However, Jeffrey also received a number of valuable assets that he might not have received had the case been litigated. For example, Jeffrey received half of the equity in the

22

family home, even though all of the equity in the home was Karen's. Karen waived the right to reimbursement of a $50,000 down payment on the house that she had made with nonmarital money before the parties were remarried. Moreover, Jeffrey retained all of his personal property in Peoria free and clear of any claim by Karen, including a car and two boats. Karen waived any claim of dissipation or any other claim against Jeffrey, except as stated in the agreement. In addition, Karen agreed to pay one-half of Emily's college expenses despite the disparate incomes of the parties, and she assumed responsibility for paying 100% of her debt with no contribution from Jeffrey. Further, the parties shared joint legal custody of Emily and stipulated to visitation by Jeffrey.

¶ 54 Jeffrey argues that the child support obligations under the agreement exceed the statutory requirement for child support, which is a minimum of 20% of the parent's net income. 750 ILCS 5/505(a)(1) (West 2012). However, the statute sets a floor, not a ceiling. *In re Marriage of McBride*, 166 Ill. App. 3d 504, 510 (1988) ("[T]he percentage guidelines set forth in section 505(a) establish a 'minimum' of a supporting party's net income, not a 'maximum.' "). A parent may contract to do more than the law requires of him. *Gaddis v. Gaddis*, 20 Ill. App. 3d 267 (1974). Thus, the fact that Jeffrey agreed to pay substantially more than the statutory minimum amount of child support does not render the agreement unconscionable.

¶ 55 Jeffrey argues that the agreement's maintenance provision is "totally one-sided and oppressive" because: (1) it requires him to pay Karen 30% of his gross income *permanently* as maintenance, despite the fact that Karen was only 47 years old at the time and "it was a 6 month marriage"; (2) it does not require Karen to obtain work or further her education, despite Karen's good health, education, and employability; and (3) unlike the Michigan Consent Judgment, the

23

maintenance provision in the agreement is not modifiable for any reason other than Karen's death or remarriage.[5]

¶ 56    We acknowledge that the agreement's maintenance provision was quite favorable to Karen. However, when considered in the context of the entire agreement, we do not find it to be so one-sided and oppressive as to render the agreement unconscionable. First, although the parties' *remarriage* lasted only 6 months, they were married for 28 years before their initial divorce. In addition, Karen never worked during the parties' marriage, and the maintenance provision in the Michigan Consent Judgment, which Jeffrey admitted entering into voluntarily, did not require her to find employment. Moreover, maintenance payments were tax deductible to Jeffrey and taxable to Karen as income. 26 U.S.C. § 71(a) (2012); *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 242 (2004), which mitigated their financial impact on Jeffrey. Further, the maintenance and child support payments together represented slightly under half of Jeffrey's gross (pre-tax) income, and Karen had to support two people on her share (whereas Jeffrey had to support only himself on his share). Finally, Jeffrey received more than half of the marital assets, including 50% of the equity in the family home, 50% of the marital share of the retirement accounts, plus all of his personal property, including a car and two boats. Admittedly, Jeffrey's after-tax income was sharply reduced by his financial obligations under the agreement. However, the evidence does not suggest that the parties' economic circumstances resulting from the agreement were so unbalanced, one-sided, and unfair, or so oppressive to Jeffrey, that the agreement may be considered unconscionable. We have considered Jeffrey's remaining arguments and find them meritless.

---

[5] Karen remarried on February 22, 2015. Accordingly, by operation of the agreement, Jeffrey's maintenance payments terminated on that date.

¶ 57    In sum, we hold that it was not against the manifest weight of the evidence for the circuit court to find that Jeffrey voluntarily entered into the agreement without duress and that the parties' economic circumstances did not support a finding of substantive unconscionability. Accordingly, the circuit court did not abuse its discretion by denying Jeffrey's petition to vacate the dissolution judgment under section 2-1401.

¶ 58    On final point bears mentioning. As noted above, to obtain relief under section 2-1401, a party raising a fact-dependent challenge to a judgment must allege specific facts showing that he acted with "due diligence" both in presenting his claim to the circuit court in the original action and in filing his section 2-1401 petition . *Arjmand*, 2013 IL App (2d) 120639, ¶ 29. Jeffrey alleged no such facts in this case. Although he read several drafts of the postnuptial agreement and negotiated changes to the agreement over a six-week period, he never informed the circuit court in the original action that the agreement was procedurally or substantively unconscionable. Moreover, Jeffrey did not file his section 2-1401 petition raising these arguments until approximately five months after the dissolution judgment was entered. He alleged no facts in his petition or supporting affidavit explaining why it took him five months to realize that the agreement's provisions were unconscionable. During the hearing, Jeffrey testified that he did not "do the math" for the obligations that he had agreed to in the postnuptial agreement at first because the parties were still going to counseling and because no support payments were being taken out of his check at that time. However, he never explained why he apparently did not "do the math" after Karen stopped attending counseling and filed for divorce, or during the five months following the entry of the dissolution judgment. The circuit court could have denied Jeffrey's petition on this basis alone. However, the circuit court never referenced the fact that the required allegations of due diligence were lacking. The circuit court's error in this regard does

25

not affect the result, because, as noted above, the evidence does not support Jeffrey's claims of unconscionability.

¶ 59                                    CONCLUSION

¶ 60          For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 61          Affirmed.

¶ 62          JUSTICE WRIGHT, specially concurring.

¶ 63          I specially concur due to language the majority has incorporated into footnote 3 discussing *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783 (s*upra* ¶ 36 n.3). As recognized by the majority in footnote 3, I agree that using either a manifest weight or abuse of discretion standard results in the same conclusion in the case at bar. Therefore, I do not take a position regarding whether the holding in *Walters* requires this court to apply an abuse of discretion standard of review rather than conduct a review of the trial court's ruling based on a manifest weight of the evidence standard. However, I concur in all other aspects of the majority's analysis set out in the body of the opinion.